# CHARLESTON.

STATE *v.* JOHN WOLFE

(No. 6762)

Submitted October 21, 1930. Decided October 28, 1930.
(Rehearing Denied December 2, 1930)

*B. H. Blagg* and *F. G. Musgrave,* for plaintiff in error.
*Howard B. Lee,* Attorney General, and *W. Elliott Nefflen,*
Assistant Attorney General, for the State.

LIVELY, PRESIDENT:

John Wolfe and James Bright were jointly indicted for possessing and operating a moonshine still. John Wolfe, found guilty of the charge and sentenced to two years' imprisonment in the penitentiary, obtained this writ of error.

In December, 1929, the sheriff of Mason County, together with the chief of police of Point Pleasant and members of the state police department, upon information that there was a moonshine still in the vicinity, conducted an unsuccessful search of defendant Wolfe's home and barn. A few minutes after the search, Wolfe, his son, Bright, and several members of the Myers' family (neighbors of Wolfe) passed the barn in a Baby Overland automobile, going in the direction of Wolfe's home. Wolfe saw the officers on his premises, but did not stop to ascertain their business. Recognizing Wolfe, the officers started after the machine which stopped in front of Wolfe's home long enough for defendant Wolfe's wife to hand

him a package (which, according to Mrs. Wolfe, contained books for Mrs. Myers). The automobile then went a few feet further and became stuck in the mud. When the occupants of the car perceived the officers following them, Bright and Wolfe's son( 15 years of age) left the car and ran, the boy stating he became fearful when he saw the officers' guns. Bright was apprehended a short distance from the car, and nearby a pint bottle, containing an odor of moonshine liquor, was found. An odor of "mash" was evident about the occupants of the car. According to defendant's testimony, Wolfe was taking the Myers' family to the main road where an automobile, too heavy for use on the road which passed Wolfe's home because of the condition of the road, would take them to Ohio, the home of the Myers' family; but no baggage was seen in the car. As the officers had approached the home of Wolfe, a boy was seen to run from the house, up the creek and in the direction from which the car came. After Wolfe and Bright were arrested, several of the officers went in that same direction to see if any liquor or moonshine stills could be located. They found the tracks of the auto in the grass along the road in front of the Myers' house; from the point where the auto tracks ended, they followed footprints leading up the hollow and then through a cornfield, about one-quarter of a mile from Wolfe's home, where they found the moonshine still, exhibited at the trial, in operation and mash barrels.

Defendants denied ownership or knowledge of the still. Two witnesses had seen John Wolfe (known as "Buff" Wolfe) on November 25, 1929, at Frank Allen's place of business in Point Pleasant; and Allen, introduced as a witness for the state, testified that on that day Wolfe had asked him to go "out to his place and solder a copper can"; that he (Allen) had gone to a place about one-fourth mile above Wolfe's home, where he put a bottom in the copper can, and that the can, exhibited at the trial, appeared to be the one repaired by him, the work being paid for by two men "who said they was 'Buff' Wolfe and Jim Bright"; but denied that the defendant Wolfe was the person who had hired him to solder the can or who had paid him, although he did admit, reluctantly, that Wolfe had talked with him twice since the arrest. Upon Allen's failure

to identify defendant as the "Buff" Wolfe who had hired and paid him to solder the can, the state evinced surprise, and offered as evidence to discredit the witness, testimony given by the witness before the grand jury at the time the defendants were indicted. It is the introduction of this testimony which defendant's counsel aver was erroneous, since, as counsel contends, the evidence is not contradictory of the testimony given by the witness Allen at the trial. That contention necessitates an examination of Allen's testimony. Allen had known Wolfe for 22 years. Before the grand jury, Allen testified that there were four men present when he repaired the copper can, that those present with whom he was acquainted and knew were Jim Bright and "Buff" Wolfe, and that "Buff" Wolfe paid him for the work, some of the money having been obtained from Bright. It is argued that none of the evidence given to the grand jurors identified the defendants. There was nothing equivocal about the testimony: Allen was talking about a man he had known for twenty-two years. What better identification could he want than an acquaintance of such duration? But, upon examination at the trial, he denied that the defendant Wolfe was the man who had hired and paid him to solder the copper can; and to explain this enigma, he stated that the men who paid him for the work "said they was 'Buff' Wolfe and Jim Bright." With such evidence before it, and the testimony of the witnesses who identified the defendant Wolfe as the man seen in Allen's place of business in Point Pleasant, the jury was warranted in its apparent conclusion that Allen's denial smacked of suspicion. Counsel for the defense argued that the witness was not hostile. The record is replete with statements to show the hostility of the witness. An example alone suffices: The prosecuting attorney asked Allen how many times he had talked with Wolfe since the arrest, and Allen answered: "Ain't none of your business as I know of"; and, in response to the question: "What did he want with you at those times?" he said, "I don't know as I have to tell that." Counsel also argued that Allen's testimony was not in the nature of a surprise. What greater surprise the prosecuting attorney could have had by a denial

of positive statements made before the grand jury cannot easily be imagined.

These conclusions bring us to the consideration of the propriety of the admission of these contradictory statements. The conception that a party calling a witness in a criminal trial must not discredit him did not affect the prosecution until the beginning of the eighteenth century, and its enforcement in the trial of Warren Hastings (1788) seems to have been the cause of its general currency. Wigmore on Evidence, (2nd Ed.), Vol. 2, p. 894, 895. The reason generally given for the rule— that a party calling a witness vouches for his credibility—has been nullified by judicial determination. *Teter* v. *Moore,* 80 W. Va. 443, 466; 28 R. C. L., 642. Another reason supporting the rule is that the party should not have the means of coercing his witness; in other words, if contradictory statements made by the witness were admissible to discredit the witness whose testimony had been disappointing, no witness would care to risk the abuse of his character which might be launched against him. The latter reason is not a cogent one, for does it not protect the disreputable witness rather than the trustworthy one? In some states the necessity for the admission of prior contradictory statements has been recognized by statute. Va. Code (1924), sec. 6215; Ga. Code (1911) sec. 5879; Cal. Code, Civil Proc. (1909) sec. 2049. And, in Virginia, the statutory provisions have been extended to criminal cases. *Hardy* v. *Com.,* 110 Va. 910, 912. The ascertainment of truth is the purpose of every trial; and rules of evidence which thwart that purpose or which tend toward rendering a correct determination of the issue more uncertain are inherently unsound. The positive testimony of the witness Allen before the grand jury induced the prosecuting attorney to call him as a witness for the state. His recalcitrant demeanor in answering questions propounded by the prosecuting attorney definitely stamped him as an adverse witness. The prosecuting attorney relied on the previous statements; if the statements given to the grand jury were different, should not the state be permitted to show the deception? The question is affirmatively answered by the weight of authority (Jones, Com. on Evidence, (2nd Ed.), Vol. 6, p. 4807), and by decisions in

this jurisdiction, where it is stated that "A party who is surprised by unfavorable testimony given by his own witness may interrogate such witness as to previous inconsistent statements made by him." *State* v. *Swiger,* 105 W. Va. 358; *State* v. *Justice,* 107 W. Va. 490.

Counsel for the defense relies upon the case of *Putnam* v. *U. S.,* 162 U. S. Sup. Ct. Rep. 687, which held: "Surprise at unexpectedly adverse testimony of one's own witness does not create an exception to the general rule which restricts the right to refresh memory to contemporaneous memoranda or writing." In that case, a bank examiner had given testimony before the grand jury four months after the occurrence of the matter described. Called as a state's witness at the trial, he surprised the prosecuting attorney by his statements, and the state then, over objection, introduced the testimony given before the grand jury. The question in that case lends itself to the determination of whether the testimony given was contemporaneous for the purpose of refreshing his memory in giving testimony at another time; and the court after deciding that it was inadmissible because not contemporaneous raised the question as to whether the rule would be suspended because the state had been surprised. The case is criticized by Wigmore, who is of the opinion that it "confuses several principles and should have no weight." (Wigmore, *supra,* sec. 905, n. 3). While we find no case which overrules the *Putnam* case, in *Di Carlo* v. *U. S.,* 6 Fed. (2d) 364, 366, the witness called for the state surprised the state's attorney by her testimony, and the court permitted the introduction of evidence given by her before the grand jury and on other occasions, stating that the question decided in *Putnam* v. *U. S.,* did not arise. The primary consideration on which the court based its opinion in the *Putnam* case is not now before this court for adjudication.

Perceiving no error in the trial below, we affirm the judgment of the lower court.

*Affirmed.*