# Richmond

CREED EPPS v. COMMONWEALTH OF VIRGINIA.

November 21, 1949.

Record Nos. 3580-3581.

Present, Hudgins, C. J., and Gregory, Spratley and Miller, JJ.

The opinion states the case.

*W. E. Neblett*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *C. Champion Bowles, Assistant Attorney General*, for the Commonwealth.

HUDGINS, C. J. delivered the opinion of the court.

The grand jury returned two indictments against Creed Epps. One charged him with maliciously shooting and wounding Ollie Hazlewood, with intent to maim, disfigure, disable and kill, and the other with maliciously shooting and wounding George Hazlewood, with the same intent. The cases were tried together and the accused was convicted on both indictments and sentenced on each to five years confinement in the penitentiary.

The substance of the testimony for the Commonwealth is, that after midnight on July 31, 1948, Garland Epps, brother of the accused, and Rosa Claiborne, entered Harry Johnson's Place in Kenbridge, Virginia, where a dance was in progress. Ollie Hazlewood asked Rosa Claiborne to dance with him. She declined. Garland Epps became offended at Ollie's attitude towards, or remarks to, Rosa, and struck him with his fist. Ollie retaliated. George Hazlewood came across the room toward the scene of the fist fight and was shot in the side by the accused. Immediately after this shot, Creed Epps turned to Ollie Hazlewood and asked "You want some of it?" and shot him in the stomach. Emma Mason testified that she heard two shots and saw Creed Epps "come out of the door with a pistol in his hand."

The substance of the testimony for the defense is, that Rosa Claiborne, Minnie Hudgins, Margie Glasgow, James Brown, Melvin Epps, Creed Epps, Elnora Freeman and Garland Epps, rode in Garland's car from near Victoria to Harry Johnson's place. Garland Epps and Rosa Claiborne got out of the car and went into the dance hall for the purpose of getting Rosa Campbell to join them as a "date" for James Brown. Creed Epps did not go into the dance hall, but remained outside near his brother's car and was there talking to Haynie Boswell at the time the shots were fired.

Garland Epps testified that, on entering the hall with Rosa Claiborne, Ollie Hazlewood attempted to force her to dance with him. He protested and Ollie hit him. During the fight with Ollie Hazlewood, he saw "another man step out there

and make a pass at me. I side stepped him, and as I straightened up, this boy threw out his foot. I got his foot and shoved him back. I ran out the door. I didn't know whether I was being shot at. My brother (Creed Epps) was in the car and I pulled my car off the place, and said 'We'll go riding some place.' We came through Kenbridge riding around. We went back to Kenbridge and Mr. Rush (the police officer) pulled me. He had a couple of warrants for the shooting of the Hazlewood boys. He said 'Who is Creed Epps? I am taking him with me.' * * * and the boy (Creed Epps) went on" with him.

The accused testified that he was 21 years old, had served two years in the army, and was discharged with a good record. His home was in Victoria, but he had worked in Norfolk and New York. He denied going into the dance hall and stated that he was on the outside when the shots were fired. When he was arrested he was asked why he shot the boys, to which he replied "I did not shoot anybody." He denied having a pistol that night and said that he never owned one.

Several witnesses testified (and their testimony was not contradicted) that the accused had the reputation of being a good, peaceful, law-abiding citizen.

It is conceded that the evidence for the Commonwealth was sufficient to sustain the verdict of the jury, but it is contended that the trial court committed reversible error in the admission of evidence and in granting instructions requested by the Commonwealth.

The main question presented is whether the trial court committed error in permitting the attorney for the Commonwealth to examine his own witness, Rosa Claiborne, as an adverse witness, and read to her, in the presence of the jury, the whole of a statement signed by her on August 3, 1948, a few days after the shooting.

Rosa Claiborne, the second witness introduced by the Commonwealth, testified that she, Garland Epps and Creed Epps, with four other persons in the same car, arrived in

front of Harry Johnson's dance hall a few minutes after midnight on July 31st; that she and Garland Epps got out of the car and went into the dance hall. "Nobody else went in." Ollie Hazlewood met her at the door and asked her to dance with him. She replied "No, I wanted to talk to Rosa Campbell. Ollie tried to pull me to the floor to dance." Garland said: "Didn't you hear the lady say she didn't want to dance with you?" He (Ollie) said "Yes, you want to make anything of it?" Garland said "That's not the point. She just said she didn't care to dance. Ollie struck Garland beside the head. I started to the door and I heard a gun go off and we came out and got in the car. *I didn't see a gun in Harry Johnson's place."*

The attorney for the Commonwealth then asked her:

"Q. Did you see Creed there?

"A. I didn't see Creed Epps in Harry Johnson's place.

"Q. Didn't you make a statement to me at my office on August 3rd in the presence of officers Rush and Eanes that you did see Creed Epps standing in the dance hall?"

The accused objected to the question on the ground that "the Commonwealth's Attorney does not have the right to cross-examine a witness for the Commonwealth."

On motion of the Commonwealth, the court directed the jury to retire, and, in their absence the attorney for the Commonwealth asked leave of the court to examine Rosa Claiborne as an adverse witness, stating that he was surprised at her testimony, as he had a written statement signed by her which was inconsistent with her present testimony.

J. W. Rush, police officer, and Samuel H. Allen, the attorney for the Commonwealth, testified that at the request of the attorney for the Commonwealth, the witness was brought to his office on August 3rd and there her account of the shooting was reduced to writing, read to, and signed by her.

The court overruled the objection of the accused and directed the attorney for the Commonwealth to proceed with his examination of the witness.

When the jury returned to the court room, the witness, in response to a question, again denied that she had seen Creed Epps in the dance hall on the night of July 31st. She was asked:

"Q. Did you make this statement to me in my office on the 3rd of August, 1948?"

The accused objected to the statement being read to the witness "for the reason that it is pure hearsay." The objection was overruled, and the witness was asked:

"Q. Did you make this statement to me in my office on the 3rd day of August, 1948: 'Saturday night, July 31, 1948, at approximately 12:15 P. M. I went to Harry Johnson's dance hall in the car of Garland Epps, I had a date with Garland and Creed Epps, Minnie Edna Hudgins, James Brown, Elnora Freeman, . . . . . Epps, Junious . . ., and his date were in the car with us. When we stopped at the dance hall, Garland and I went in to see Rosa Lee Campbell. We left Creed Epps standing outside talking with a boy from Victoria. Just as we walked into the dance hall, several boys came over to me and asked me to dance. I told them that I did not care to dance as I was only going to be there a minute. Garland and I walked to the back door and then saw Rosa Lee dancing near the booths: we went over and talked with Rosa Lee and started to leave. *I then saw Creed Epps standing on the left side of the dance hall.* Garland and I began to walk toward the front door. (Ollie Hazlewood) Hays came over and asked me again to dance and I told him that I did not care to dance. Hays then grabbed hold of me and tried to pull me onto the dance floor. About that time Garland told Hays to let me alone as he heard what I had said. Hays then asked Garland if he wanted to make something of it. Then Hays hit Garland in the face and knocked Garland onto the floor. The next thing I knew there was a shot and then there was another shot. I ran out to the car and jumped into the back seat, Creed, Garland and Minnie were in the front seat. Garland pulled away and drove down to the Starlight Church where

we stayed for about five minutes. I was the only one to get out of the car at the church. We then went back to Victoria to the home of James Brown where we stayed for approximately two hours, where we sat around and talked. While we were at James Brown's house, *I saw Creed Epps pull an automatic pistol out of his pocket and put it on the table. I had seen Creed have this pistol with him many times before Saturday night.* After we left James Brown's house, we drove back into Kenbridge, all of us returned to Kenbridge except James, and there we were stopped by Officer Rush.' *Do you deny that you made this statement?*

"A. No, sir, I don't deny it.

"Q. Did you see Creed have a gun, an automatic pistol, at James Brown's house on the 31st day of July, 1948?

"A. No, sir.

"Q. Did you make a statement to me in the presence of Officers Rush and Eanes as follows: 'While we were at James Brown's house, I saw Creed Epps pull an automatic pistol out of his pocket and put it on the table. I had seen Creed have this pistol with him many times before Saturday night.' Had you seen Creed have this pistol?

"A. No, sir.

"Q. Had you ever seen Creed have a pistol before?

"A. No, sir.

"Q. Did you see Creed have a pistol that night?

"A. No, sir, I didn't see him have one that night."

The ruling of the trial court permitting the Commonwealth to impeach its own witness by proof of former inconsistent statements was in accord with the general rule prevailing in most jurisdictions. Underhill's Criminal Evidence, 4th Ed., sec. 422, p. 853; Wharton's Criminal Evidence, Vol. 3, 11th Ed., sec. 1391, p. 2276; Wigmore on Evidence, 3d Ed., sec. 896, p. 383, etc.; *State* v. *Wolfe*, 109 W. Va. 590, 156 S. E. 56, 74 A. L. R. 1039; Annotation 1042; West's Virginia & West Virginia Dig. (Witnesses), Key No. 380(5), p. 582; 58 Am. Jur. (Witnesses), sec. 792, pp. 437-439.

This has been the statutory rule in Virginia since January, 1900. Acts of 1899-1900, p. 124, Chap. 117; Code of 1919, sec. 6215; Michie's 1942 Code, sec. 6215.

The statute provides (1) that a party may not impeach his own witness by general evidence of bad character, but (2) if, in the opinion of the court, the witness proves adverse, then such party may prove (3) that the witness has made at other times a statement inconsistent with this present testimony. However, before proof of prior inconsistent statements may be introduced, the circumstances of such statement "sufficient to designate the particular occasion, must be mentioned to the witness, and he must be asked whether or not he has made such statement."

The whole theory of the Commonwealth, supported by the testimony of several witnesses, is that the shots were fired by Creed Epps in the dance hall. If he had no pistol or did not enter the dance hall he could not have been guilty of the offenses charged. The written statement of Rosa Claiborne supported the theory of the Commonwealth. There is nothing in the record to indicate that the attorney for the Commonwealth knew, or had reason to believe, prior to introducing her as a witness, that her testimony would be inconsistent with her written statement signed in his presence on August 3rd. When, apparently for the first time, he was apprised of this fact, he promptly so informed the court, and obtained leave of the court to examine her as an adverse witness. He called to the attention of the witness "the particular occasion on which the writing is supposed to have been made," and asked her if she denied making the statement. She did not deny making the statement after it had been read to her. Full opportunity was given her to explain the inconsistencies in the statement and her present testimony, but she did not avail herself of this opportunity, and offered none.

The procedure was in accord with the provisions of sections 6215 and 6216 of Michie's 1942 Code.

The only ground of objection stated by the accused

to the reading of the written statement was that it was hearsay evidence. This exception to the general rule permitting the introduction of such hearsay testimony is as well established as the rule itself.

The statement was not admissible for the purpose of proving that Creed Epps was in the dance hall at the time the shot was fired, or that he had possession of a pistol at the time, or soon thereafter, but it was admissible solely for the purpose of permitting the jury to determine the weight to be given the testimony of this particular witness. This is the general rule limiting or restricting the jury in their consideration of prior inconsistent statements. The Virginia statute (6215) expressly declares that "In every such case the court, if requested by either party, shall instruct the jury not to consider the evidence of such inconsistent statements, except for the purpose of contradicting the witness."

After all the testimony had been introduced, the court, on request of the accused, instructed the jury to the effect that the evidence was admitted only for the purpose of permitting "the jury to determine whether or not the witness is entitled to credit." While the instruction could have been drafted in more explicit language, the court gave it in the form requested by the accused.

The accused contends in this court that it was reversible error for the attorney for the Commonwealth to be allowed to read the "whole" of the signed statement.

This objection was not raised in the lower court, and, even in this court, the accused does not undertake to point out what part of the statement should have been excluded. While the witness at one time denied making the statement (or rather she testified that she did not remember making it), after the statement was read to her she, in effect, acknowledged that she did make it, and then testified that she did not see Creed Epps in the dance hall. She did not see him have a gun at James Brown's house, and she had never seen him with a gun.

So much of the statement as was inconsistent with

her testimony was clearly admissible for the purpose stated. If the accused had desired to exclude any part of the written statement which was not pertinent to contradict the witness, he should have brought the matter to the attention of he trial court. Not having done so, it is too late for him to raise the question in this court.

The next assignment of error is based on the ruling of the court in giving Instructions Nos. 1, 2, and 3, over the objection of the accused.

Instruction No. 1 simply told the jury that on the evidence they could return one of four verdicts, to-wit: (1) malicious wounding; (2) unlawful wounding; (3) assault and battery; and (4) not guilty, and defined the punishment prescribed by statute for each offense.

Instruction No. 2 was as follows:

"The Court instructs the jury that a man is presumed to intend that which he does, and if you believe from the evidence that the defendant, with a deadly weapon in his possession, without any or upon very slight provocation, shot the said George Hazlewood with the intent to maim, disfigure, disable or kill him, then the defendant is guilt— of maliciously shooting the said George Hazlewood as charged in the indictment."

Instruction No. 3 was identical with No. 2, with the name of Ollie Hazlewood used in the place of George Hazlewood.

The basis of the objection made to the instructions was that the Commonwealth introduced no evidence of malicious wounding.

Ollie Hazlewood, a witness for the Commonwealth, testified that when Rosa Claiborne declined to dance with him, he started away from her, and as he did "Creed's brother (Garland) hit me beside the neck, and I hit him back. George came across and that boy shot George."

■ If, under these circumstances, George Hazlewood had died from the wound, the accused would have been guilty of murder in the first degree.

In *Johnson* v. *Commonwealth*, 135 Va. 524, 528, 115

S. E. 673, 30 A. L. R. 755, Judge Kelly, speaking for the court, said: "Whether a prisoner on trial for malicious shooting with intent to kill is guilty of that charge depends upon whether if death had resulted he would have been guilty of murder—either in the first or second degree, it matters not which."

There is no evidence tending to show that the shots were fired and the wounds inflicted in defense of either Creed Epps or Garland Epps. On the contrary, the evidence for the accused tends to show that he was not present and did not fire either shot. The accused cannot, in one breath, claim that he was not at the scene of the crime and knew nothing about it, and in the next breath, contend that he fired the shots in defense of his or his brother's life.

We find no error in the judgment of the trial court, and it is

*Affirmed.*