## 20209

The STATE, Respondent, v. Duane Ivan ELLEFSON, Appellant.

(224 S. E. (2d) 666)

*Messrs. H. F. Partee* and *W. Daniel Yarborough, Jr.*, of Greenville, *for Appellant,*

*Messrs. Daniel R. McLeod, Atty. Gen., Joseph R. Barker, Asst. Atty Gen.*, and *Robert N. Wells, Jr., Staff Atty.*, of Columbia, and *William W. Wilkins, Jr., Sol.*, of Greenville, *for Respondent,*

April 20, 1976.

Ness, Justice:

Appellant, Duane Ellefson, was convicted of breach of trust and sentenced to five years imprisonment. He raises two questions: (1) Did the trial judge err in characterizing

one of the State's witnesses, Karen Tinsley, as hostile and permitting the State to cross examine her, (2) Should evidence, admitted over the appellant's objection, have been excluded as a product of an illegal search and seizure? We find no merit in the first question, however, we agree with the second. The conviction is reversed and remanded for a new trial.

After being sworn as a witness, Miss Tinsley completely repudiated a pretrial, sworn statement and testified in favor of the appellant. The solicitor requested the jury be excused, moved that the witness be declared hostile and that he be allowed to impeach her with the prior inconsistent statement. The court examined Miss Tinsley and determined that earlier in the day, she told the solicitor she would testify consistent with her pretrial statement. The court held that the State had been surprised by the witness' testimony, and declared her a hostile witness.

Appellant's counsel resisted the motion. He argued the State should have known the witness would repudiate her prior statement because she was a traveling companion of the appellant and visited him frequently throughout his pretrial detention. Appellant did not offer testimony to dispute the State's position.

Ordinarily, counsel may not contradict his own witness by introducing inconsistent statements made by the witness. This rule is inapplicable when a witness is declared hostile. In order to have the witness declared hostile on the ground of surprise, it is essential that the party has been actually surprised by the testimony, or deceived or entrapped into introducing the witness because of the contradictory statements. However, a party who introduces a witness will not be permitted to avail himself of a feigned suprise in order to get to the jury contradictory statements of the witness previously given, when such statements are otherwise incompetent. *State v. Harvey,* 253 S. C. 328, 170 S. E. (2d) 657 (1969) ; *Gilfillan v. Gilfillan,* 242 S. C. 258,

130 S. E. (2d) 578 (1963); *State v. Nelson,* 192 S. C. 422, 7 S. E. (2d) 72 (1940).

Whether a party has been surprised is largely a matter within the discretion of the trial judge. The facts in the instant appeal are similar to *State v. Trull,* 232 S. C. 250, 101 S. E. (2d) 648 (1958). In *Trull,* for procedural reasons, the issue of surprise was not properly raised on .appeal; however, the court approvingly quoted from *State v. Wolfe,* 109 W. Va. 590, 156 S. E. 56, 57 (.1930). "What greater surprise the prosecuting attorney could have had (than) by a denial of positive statements made before the grand jury (here in writing before State and County law enforcement officers) cannot easily be imagined." (Language in parenthesis from the *Trull* opinion.) 232 S. C. p. 253, 101 S. E. (2d) p. 649. The appellant has failed to demonstrate an abuse of discretion in this case.

The second exception alleges error in the admission of three very incriminating letters written by the appellant to Miss Tinsley while in pretrial confinement at the Greenville County Jail.[1] The letters were obtained by the State through the efforts of a detective who was *not connected* with the operation of the jail. *His efforts were entirely investigatory* and in pursuit of securing a conviction. The detective was given permission to read and photocopy the letters by the jailor who routinely scanned outgoing mail as a security precaution.

The State relies principally upon *Stroud v. United States,* 251 U. S. 15, 40 S. Ct. 50, 64 L. Ed. 103 (1919) in which a convicted prisoner, while serving his sentence, was charged with killing a guard at the prison. At the subsequent mur-

---

[1] The letters were most incriminating. They recited the story he wanted Miss Tinsley to relate and also in one letter, he stated: "do you remember a metal change box? . . . I sure hope it wasn't in your car? If it was we will have to change the story, but for now keep it the same. If I could talk to you I believe I could work out a story that would free me. If you would go along with it." Again, "You don't remember Gene's last name or where he lives, all you know is that he lives close to Six Flags, O. K."

der trial, certain incriminating letters were introduced into evidence. The defendant had written them while in prison and they had been seized by prison officials. The court ruled the letters were properly admitted. It stated:

"In this instance the letters were voluntarily written, no threat or coercion was used to obtain them, nor were they seized without process. *They came into the possession of the officials of the penitentiary under established practice, reasonably designed to promote the discipline of the institution.* Under such circumstances there was neither testimony required of the accused, nor unreasonable search and seizure, in violation of his constitutional rights." 251 U. S. at 21-22, 40 S. Ct. at 53. (Emphasis supplied.)

*Stroud* has spawned a host of decisions upholding introduction of evidence resulting from prison inspections. In each instance, the search was either explicitly or implicitly conceived as being properly calculated to maintain prison or jail security. See cases catalogued in 52 A. L. R. (3d) 548.

The State has cited three cases for the proposition that photocopying of letters is proper even when the purpose is solely for use as evidence. *United States v. Wilson,* 447 F. (2d) 1 (9th Cir. 1971) ; *Denson v. United States,* 424 F. (2d) 329 (10th Cir. 1970) ; and *Cox v. Crouse,* 376 F. (2d) 824 (10th Cir. 1967). In each case, jail security justified the initial search and reading of the letters.

The recent case of *Procunier v. Martinez,* 416 U. S. 396, 94 S. Ct. 1800, 40 L. Ed. (2d) 224 (1974) casts grave doubt upon the continued vitality of *Stroud.* Although *Procunier* was a class action suit by prison inmates attacking mail censorship by prison officials and was analyzed in terms of First Amendment rights, the court's analysis applies forcefully to the instant case. The court reconfirmed the need and desirability of granting wide discretion to officials in the operation of jail facilities, but it invalidated indiscriminate censorship of prison mail. Censorship was justified only if the State satisfied a two prong test. "First, the

regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. . . . Second, the *limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.*" (Emphasis supplied) at page 1811.

Here the appellant was merely in pretrial confinement. The only legitimate purpose for confining him was to insure his presence at trial. *Stack v. Boyle,* 342 U. S. 1, 72 S. Ct. 1, 96 L. Ed. 3 (1951). If jail security justified surveillance of his mail, then the *jail officials* could open the letters in order to achieve that legitimate government purpose. However, the shibboleth of jail security is not a passport to wholesale abuse of the appellant's constitutional rights.

When a pretrial detainee remains in custody, he is not disrobed of his constitutional rights and laid bare for the zealous investigation of his case. He is cloaked with the presumption of innocence. His rights are curtailed only to the extent "justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U. S. 266, 285, 68 S. Ct. 1049, 1060, 92 L. Ed. 1356 (1948). Even a convicted prisoner does not shed basic constitutional rights at the prison gate. Rather, he "retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." *Coffin v. Reichard,* 143 F. (2d) 443, 445 (6th Cir. 1944), *Procunier v. Martinez, supra,* Marshall concurring page 1816.

The testimony of the detective refutes the idea that the search was for any legitimate jail purpose.[2] No

---

[2] The Detective testified:
  "Q. Were you censoring this mail to try to get evidence for this case?
  "A. I was.
  "Q. You weren't doing it for any security?
  "A. No, sir.
  "Q. Purposes?
  "A. No, sir.
  "Q. Solely to obtain evidence?
  "A. Yes, sir, to obtain evidence." (Transcript page 158.)

warrant was issued. Therefore, "—the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *Coolidge v. New Hampshire,* 403 U. S. 443, 454, 455, 91 S. Ct. 2022, 2032, 29 L. Ed. (2d) 564 (1971). There must be a showing by the State that "the exigencies of the situation made that course imperative." *McDonald v. U. S.,* 335 U. S. 451, 456, 69 S. Ct. 191, 93 L. Ed. 153 (1948).

Here, there were no exigent circumstances, nor any attempt to show the existence of probable cause. The opening and reading of the letters was entirely exploratory and contravenes the very purpose of the constitutional safeguard against unreasonable searches and seizures. Additionally, the search impinged upon the Appellant's First Amendment right, as incorporated by the Fourteenth Amendment, to be able to communicate without the uninvited ears and eyes of the government. As. Mr. Justice Holmes observed over a half century ago, "the use of the mails is almost as much a part of free speech as the right to use our tongues . . ." *Milwaukee Social Democratic Publishing Co. v. Burleson,* 255 U. S. 407, 437, 41 S. Ct. 352, 363, 65 L. Ed. 704 (1921) dissenting opinion quoted with approval in *Blount v. Rizzi,* 400 U. S. 410, 416, 91 S. Ct. 423, 428, 27 L. Ed. (2d) 498 (1971).

What is particularly disturbing here is the context in which this search took place. When an accused is not bailable, he is somewhat disadvantaged in preparing for trial. If he is to marshall facts in support of his defense, he necessarily must rely on persons outside the jail. *Stack v. Boyle, supra.* Perhaps an accused may have to run the risk of exposing his communications to a jailor, if jail security justifies opening and reading all incoming and outgoing mail.[3]

---

[3] Apparently, the jailor did not read the letters. His definition of scan was "just going through the leaflets, the pages in the letter making sure there's no . . .." (Tr. p. 187.)

But see Mr. Justice Marshall's concurring opinion in *Procunier v. Martinez, supra.* Nonetheless, to allow an independent prosecution team the right to indiscriminately inspect letters written by the accused is to hack at the roots of any defense.

To paraphrase Justice Black, freedom to communicate privately with associates to develop a possible defense is as important to a fair trial as is the heart to the human body. In fact, this right is the heart of any defense. If that heart be weakened, the result is debilitation; if it be stilled, the result is death. *Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc.,* 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 836 (1941).

When appellant was processed into the jail, he signed a card authorizing jail officials to read his mail. The State attempts to elevate this into a waiver of constitutional rights. The details surrounding the waiver card do not appear in the record. At oral argument the Attorney General conceded that he did not know what the jail officials would have done had the appellant refused to sign the card. Apparently, all inmates are required to .sign the card and this is accomplished routinely during the reception process.

If the State relies upon the consent to search, it has the burden of proving the voluntariness of the consent. *Bumper v. North Carolina,* 391 U. S. 543, 88 S. Ct. 1788, 20 L. Ed. (2d) 797 (1968). The court thus cannot assume there was consent. *People v. Henry,* 65 Cal. (2d) 842, 56 Cal. Rptr. 485, 423 P. (2d) 557 (1967). For noncustodial searches, the current test is whether or not the consent was voluntary under the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U. S. 218, 93 S. Ct. 2041, 36 L. Ed. (2d) 854 (1973). The skeletal details

of the so called "consent" belie it.[4] If we were to hold the appellant consented to waive his constitutional rights here, the doctrine of consent would be effectively emasculated.

We take no pleasure in reversing this conviction. The letters which we exclude confirm the propriety of the jury's verdict. Nevertheless, our respect for constitutional rights of citizens requires that the State not seek advantage by the use of evidence gained by trammeling upon those rights. See the discussion of the exclusionary rule in *State v. Sachs,* 264 S. C. 541, 216 S. E. (2d) 501 (1975).

Reversed and Remanded.

LITTLEJOHN, RHODES and GREGORY, JJ., concur.

LEWIS, C. J., dissents.

LEWIS, Chief Justice (dissenting).

I dissent.

I agree that the trial judge properly permitted the cross-examination of Karen Tinsley as a hostile witness, but disagree with the holding that error was committed in the admission of the incriminating letters written by appellant. These letters, in my opinion, were properly admitted into evidence and I would therefore affirm the judgment under appeal.

At the time appellant was placed in jail, he signed a card authorizing jail officials to read his mail. The record sustains the inference that this was done in accordance with the usual practice of the prison, as a means of enforcing prison security and discipline and in order to give notice to the prisoner that prison officials would "scan the mail, in-

---

[4] The detective, who was not connected with the jail, stated the procedure for censoring mail was written "on the back of a card down at the County Jail," and that the appellant had signed the card. The other testimony was that of a detention officer at the jail. He testified:
"When a person is booked ino the jail he signed on the back of a card which is used in the booking process *that he is notified in writing that we will scan the mail,* in-going and out-going, and *we request them to realize* this with the signature stating such, granting the jail the authority to do that. They waive their right." (Tr. p. 187.)

going and out-going." This right to censor a prisoner's mail is generally upheld by the courts and is not questioned here.

Appellant contends, however, in this appeal, that the State obtained the letters in question in violation of his rights under the Fourth Amendment to the United States Constitution. He argues that the letters were illegally obtained by the detective who was permitted by the jailer to read and photograph the letters to use as evidence at the trial. There is no merit to this contention.

The details of the circumstances surrounding the signing of the card, agreeing to censorship, are not shown in this record. Appellant makes no claim however that this card was not signed voluntarily and understandingly. The record does show conclusively however that appellant voluntarily wrote the letters in question and turned them over to the prison officials whom he had previously authorized to read his mail. There is no basis, under these circumstances, to hold that the letters were obtained by an unconstitutional search and seizure. As stated in *State v. Johnson,* Mo., 456 S. W. (2d) 1, 3 and 476 S. W. (2d) 516, 518: "In the final analysis, he himself laid in front of the jailer that which he now seeks to preserve as private."

Under similar facts, the United States Supreme Court, in *Stroud v. United States,* 251 U. S. 15, 40 S. Ct. 50, 64 L. Ed. 103, held that there was no unlawful seizure. The court stated in *Stroud*:

"Certain letters were offered in evidence at the trial containing expressions tending to establish the guilt of the accused. These letters were written by him after the homicide and while he was an inmate of the penitentiary at Leavenworth. They were voluntarily written, and under the practice and discipline of the prison were turned over ultimately to the warden, who furnished them to the district attorney. . . . In this instance the letters were voluntarily written, no threat or coercion was used to obtain them, nor were they seized without process. They came into the possession of

the officials of the penitentiary under established practice, reasonably designed to promote the discipline of the institution. Under such circumstances there was neither testimony required of the accused, nor unreasonable search and seizure, in violation of his constitutional rights."

I would affirm the judgment.