United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 4, 2004**

Charles R. Fulbruge III
Clerk

REVISED FEBRUARY 25, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-40492

_____


JASEN SHANE BUSBY

                              Petitioner - Appellant

      v.

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION

                              Respondent - Appellee

_____

Appeal from the United States District Court
for the Eastern District of Texas
_____

Before KING, Chief Judge, and BARKSDALE and STEWART, Circuit
Judges.

KING, Chief Judge:

     Petitioner-appellant Jasen Shane Busby has been convicted of

capital murder in the Texas state courts and sentenced to death.

The district court denied Busby's petition for a writ of habeas

corpus but granted Busby a certificate of appealability (COA) on

several issues.  This court later denied Busby's request for a

COA on additional claims.  We now address the issues for which

Busby was granted a COA.  Finding them without merit under the

governing standards, we affirm the district court's denial of habeas relief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The basic facts of the crime are no longer disputed at this stage of the proceedings. Busby, his friend Christopher Kelley, and Kelley's girlfriend Brandy Gray lived together in a cabin in Maydelle, Texas. On Sunday, April 16, 1995, they spent the night in a trailer in Antioch with Tenille Thompson, an acquaintance. The next morning, Busby drove Kelley's truck to buy donuts for the group for breakfast. When Busby returned, he was accompanied by Darrell Smith. The group made several trips to various places that day, and at one point some members of the group, including Busby, took turns shooting an assault rifle outside of the Maydelle cabin. During the course of the day they also purchased some marijuana, which some of the group, including Busby, smoked later that night at the Antioch trailer.

Around ten o'clock that night, Busby and Smith went outside the trailer. Kelley, who was still inside the trailer, heard them loading a gun and talking about how many bullets were in it. Kelley started to open the door but found that someone else was already opening it from the other side. Busby then shot Kelley, Gray, and Thompson and drove off in Kelley's truck with Smith. The two women were dead. Kelley, with a gunshot wound in the neck, went to a neighboring house for help. He described Busby

2

and the truck to the police. Kelley survived the wound and would testify at Busby's trial, providing many of the details recounted above.

The police took Busby and Smith into custody on the night of the shootings after an officer spotted Kelley's truck on the highway. Busby had a clip of bullets in his pocket. Investigators spoke to both men late that night and into the next morning. After being read his rights, Busby gave a taped confession, which he would later claim was the product of drug intoxication. Smith told investigators that Busby had hidden the murder weapon, and Smith showed them where to find it. The authorities recovered the gun, which was later linked to shells found at the scene of the killings. Busby was indicted for capital murder.

The legal claims in this appeal arise from two sets of circumstances that occurred while Busby was awaiting trial. First, Busby claims that pretrial publicity poisoned the atmosphere in Cherokee County, the site of the trial. At the time, Cherokee County had a population of approximately 42,000 people. The only local daily newspaper was the Jacksonville Daily Progress, with a paid circulation of around 5,500. The paper ran at least a dozen articles about the murders on its front page, including articles and photographs that identified Busby as the only suspect, cited evidence against him, referred to a confession, pictured him in handcuffs, and reported an

3

allegation that he was a Satanist. The Cherokeean Herald, a weekly paper with a circulation of about 3,500, gave the case less prominent coverage but also ran articles about the case, including stories concerning the amount of fees that Busby's court-appointed lawyers were incurring at the taxpayers' expense.

Busby filed a motion to change venue. During a hearing on the motion, the court heard testimony from several prominent citizens who opined, based on their reading of community sentiment, that many residents of the county had already decided that Busby was guilty. The county sheriff testified that there were threats against Busby's life; he stated that he had opposed the defense team's request to visit the crime scene because he feared violence. Other citizens who testified at the hearing, including some of those called by Busby, said that there had been relatively little discussion of the case in the community and that many people had not heard of Busby. The trial judge denied the motion to change venue.

The second set of facts relevant to this appeal involves certain letters that Busby wrote to friends and family while in pretrial detention. The jail's policy manual stated that all outgoing non-privileged inmate mail could be inspected and read, and it regularly was. Pursuant to this policy, jail staff came across letters in which Busby admitted to and described the killings, made what appeared to be threats against others, and suggested that a correspondent send him drugs. (This was after

4

Busby had already admitted to the killings in the taped confession, mentioned above.)  Before sending the letters off to their addressees, the jailers copied them and turned the copies over to investigators.

At trial, Busby objected to the state's use of the letters against him.  He pointed out that no warrant had been issued to search Busby's mail, and he contended that reading the letters constituted an illegal interrogation.  Relevant to this appeal, Busby also claimed that the jail's policy violated the First Amendment, although that was not the primary basis for his objection.  In deciding whether to admit the letters, the trial judge heard testimony from the county sheriff and the jail administrator, who testified regarding the jail's mail policies. They stated that jail staff read mail in order to watch for suicide risks, escape plans, threats of violence, and other dangers to jail safety and security.  It does not appear from the record that Busby was targeted in particular for surveillance, nor does it appear that the mail policy, which accorded with state jail regulations,[1] was directed at detecting inculpatory

---

[1]    In 1994, the Texas Commission on Jail Standards adopted new regulations concerning inmates' mail privileges.  The regulations provided, regarding non-privileged mail: "Outgoing correspondence may be opened and read.  Correspondence may be censored provided a legitimate penological interest exists.  A copy of the original correspondence should be retained."  19 Tex. Reg. 9880 (Dec. 13, 1994) (codified as amended at 37 TEX. ADMIN. CODE § 291.2(3)(B) (West 2003)).

communications.  The jail administrator testified that inmates were not given copies of the jail's policy manual, which explicitly authorized the reading of inmates' non-privileged mail.  The inmates instead received a brief inmate handbook, which did not explicitly warn inmates that their mail would be read.  The inmate handbook did, however, instruct inmates not to seal outgoing envelopes unless the envelope contained privileged mail; according to the handbook, sealed non-privileged mail would be rejected.  Accordingly, the practice within the jail was that non-privileged mail was given to jailers unsealed.  Some of Busby's letters, including his early letters, suggest that Busby suspected that jailers could read his mail.  The trial judge overruled Busby's objections to using the letters at trial.

During the guilt phase of the trial, the state called Mark Oppen, a friend who had received some of the letters the jailers had read and copied.  Through Oppen, the state introduced two letters in which Busby described the killings.  On cross-examination, the defense introduced another letter that Busby wrote to Oppen in which Busby denied committing the murders and told Oppen to throw away the previous letters.

The state introduced dozens more letters in the punishment phase of the trial.  Some of these letters showed Busby as remorseless and revealed violent thoughts directed at Kelley and the judge.  Other letters—including some of those introduced by the state as well as letters put into evidence by the

defense——were more sympathetic in that they showed Busby's love for his family and his newfound devotion to the Bible; many of the letters were arguably mitigating because they suggested that Busby had been in a marijuana- and LSD-induced daze on the night of the killings.  Apart from the letters, the state's case in the punishment phase included testimony from people to whom Busby had made arguably threatening remarks, testimony from an inmate who had overheard Busby saying that he would go on a shooting "rampage" if he got out, and expert testimony from a psychologist who opined that there was a significant risk that Busby would commit future acts of violence.  The defense called a dozen witnesses in the punishment phase, including jail employees who testified to Busby's good behavior in jail, two medical experts, and ministers, friends, and family who spoke of Busby's non-violent character.

Busby was sentenced to death on July 27, 1996.  The conviction was automatically appealed to the Texas Court of Criminal Appeals.  His direct appeal asserted eleven points of error, but the state's use of the letters was not among them. The Court of Criminal Appeals affirmed Busby's conviction and sentence on March 31, 1999.  Busby v. Texas, 990 S.W.2d 263 (Tex. Crim. App. 1999).  Busby unsuccessfully sought certiorari from the United States Supreme Court.  Busby v. Texas, 528 U.S. 1081 (2000).

7

On November 20, 1998, Busby filed an application for post-conviction relief in state court. Following an evidentiary hearing, the trial court entered findings of fact and conclusions of law and recommended that Busby's request for habeas relief be denied.[2] In a brief order, the Texas Court of Criminal Appeals adopted the lower court's findings, conclusions, and recommendation without further comment. Ex parte Busby, No. 28,761-01 (Tex. Crim. App. Sept. 13, 2000).

On September 12, 2001, Busby filed a petition for federal habeas corpus relief in the United States District Court for the Eastern District of Texas. The district court granted the state's motion for summary judgment in an unpublished order and accompanying memorandum opinion. Busby v. Cockrell, No. 5:02cv264 (E.D. Tex. Mar. 31, 2003). The district court did, however, grant a COA on the following issues:

1.    Whether Busby's appellate attorney's decision not to appeal the trial court's denial of Busby's motion to exclude the letters constituted ineffective assistance of counsel?

2.    Whether the trial court's denial of Busby's motion to suppress the letters violated the First Amendment?

3.    Whether the trial court's denial of Busby's motion for a change of venue deprived him of a fair trial?

---

[2]    Both sides submitted proposed findings and conclusions to the court. The findings and conclusions issued by the court are in all material respects the same as those proposed by the state.

8

4. Whether the change of venue/fair trial issue was exhausted?[3]

As we have already denied Busby's request for a COA on additional issues, Busby v. Cockrell, No. 03-40492, 2003 WL 21954211 (5th Cir. Aug. 15, 2003), today's decision considers only the three issues listed above.

## II. DISCUSSION

## A. Standard for Granting Relief

In a habeas corpus appeal, we review the district court's findings of fact for clear error and its conclusions of law de novo, applying the same standards to the state court's decision as did the district court. Martinez v. Johnson, 255 F.3d 229, 237 (5th Cir. 2001). Busby's habeas petition is governed by the standards established by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996).

Under AEDPA, we may not grant relief on a claim that the state courts have adjudicated on the merits "unless the adjudication of the claim . . . resulted in a decision that was

---

[3] Busby's habeas petition, and his brief here, phrase the issues somewhat differently, as we explain later. We recognize that the question whether Busby's change of venue claim was properly exhausted is not itself a ground for relief; it is not an issue that raises "a substantial showing of the denial of a constitutional right." See 28 U.S.C. § 2253(c)(2) (2000). But the lack of exhaustion can be a barrier to relief on the underlying substantive claim, and so our opinion must address exhaustion in that context.

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (2000). A state court's decision is deemed "contrary to" clearly established federal law if it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405–06 (2000). A state court's decision runs afoul of the "unreasonable application" prong of § 2254(d)(1) "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." Bell v. Cone, 535 U.S. 685, 694 (2002). The Supreme Court has made it clear that an unreasonable application is different from an incorrect application. Id. Finally, we presume that the state court's factual determinations are correct, and we may grant relief only if a factual determination is unreasonable based on the evidence presented to the state court. 28 U.S.C. § 2254(d)(2), (e)(1).

## B. Ineffective Assistance of Appellate Counsel

Busby claims that the attorney appointed to represent him in his direct appeal was constitutionally ineffective for failing to argue that the trial court erred in admitting the jailhouse

10

letters into evidence, over Busby's objection, in both the guilt phase and the punishment phase of the trial.

The state habeas court, after holding an evidentiary hearing, rejected Busby's ineffective assistance of counsel claim. The court did not set forth its reasoning in a formal opinion but instead produced a list of numbered findings of fact and conclusions of law. This does not mean that § 2254(d)'s deferential standard of review is inapplicable, however: as we have made clear in past cases, this court "review[s] only a state court's 'decision,' and not the written opinion explaining that decision." Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (per curiam), cert. denied sub nom. Neal v. Epps, 537 U.S. 1104 (2003); see also Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (holding that AEDPA standards apply to state court decisions even when the state court does not cite governing Supreme Court cases).

To make out a claim of ineffective assistance of counsel, Busby must show both that his counsel's performance was deficient (i.e., that it "fell below an objective standard of reasonableness") and that he was prejudiced by his counsel's deficient performance. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Regarding the first prong, we must be "highly deferential" when evaluating counsel's performance; "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound

11

trial strategy." Id. at 689 (internal quotation marks omitted).

Regarding the second prong, Busby "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

The familiar Strickland framework applies to a prisoner's claim that his appellate counsel was ineffective for failing to raise a certain issue on appeal. See Smith v. Robbins, 528 U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527, 535-36 (1986). Regarding the operation of the deficient performance prong in this context, we have stated that "[c]ounsel does not need to raise every nonfrivolous ground of appeal available. Nonetheless, a reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." United States v. Williamson, 183 F.3d 458, 462 (5th Cir. 1999) (citations, footnotes, and internal quotation marks omitted).

At the evidentiary hearing, the state habeas court received testimony from Busby and from the attorney appointed to represent Busby in the direct appeal, Forrest Phifer. Busby testified that he asked Phifer to raise the issue regarding the admission of the letters in his appellate brief. According to Busby, Phifer said that including the issue would detract from other, more promising

12

grounds for reversal.  Phifer himself took the stand at the hearing and said that as he was formulating his issues for appeal, he received a slip opinion from the Court of Criminal Appeals regarding a pretrial detainee's privacy rights, in particular whether a drawing could be seized from the detainee's cell and admitted against him.  He could not remember the style of the case but, when given the name Soria v. State, it was familiar; Phifer said that Soria was "probably" the slip opinion that deterred him from appealing the use of the letters, though he could not be sure.

In Soria, the state's presentation to the jury in the punishment phase of the defendant's trial included a self-portrait, seized from the defendant's cell, in which the defendant drew himself holding a bloody knife.  933 S.W.2d 46, 50 (Tex. Crim. App. 1996).  The Court of Criminal Appeals cited the United States Supreme Court's decision in Hudson v. Palmer, 468 U.S. 517 (1984), for the proposition that an inmate has no Fourth Amendment expectation of privacy in his cell, and it cited the decision in Block v. Rutherford, 468 U.S. 576 (1984), for the proposition that a shakedown search of a pretrial detainee's cell does not violate the Fourth Amendment or due process.  Soria, 933 S.W.2d at 60.  The Court of Criminal Appeals therefore rejected the defendant's Fourth Amendment challenge to the admission of the drawing.  Id.

13

At the evidentiary hearing, Phifer testified to the "disappointment" he felt when he saw the Soria slip opinion. He continued:

> I mean, [the slip opinion] was talking specifically on right of privacy of an inmate and it talked about some kind of writing, I don't know if it was pictures or letters, it was something in writing that was objected to on the grounds of privacy, invasion of privacy. And I said, well, this point would go in front of [the] same Court, in front of the same judges, fairly soon after this opinion and I have no reason to believe that the Court would look at it differently. I said if I did this it would be futile, that it would simply diminish my other points and I wanted to go with the strongest points I had.

Phifer testified that since he already had ten or eleven points of error, he feared that adding this issue would give the appeal a "shot gun" character. He therefore made the "strategical [sic] decision" not to include this point of error.

Strategic decisions of the sort to which Phifer testified can rarely constitute ineffective assistance of counsel, so long as they are based on reasonable investigations of the applicable law and facts. Strickland, 466 U.S. at 691. Phifer was apparently well aware of the facts regarding the letters, but Soria dissuaded him from raising a legal challenge to their use. Soria itself cited two United States Supreme Court cases, Hudson v. Palmer and Block v. Rutherford, that, while not directly on all fours with Busby's case, further tended to show that Busby's privacy claims lacked merit. It is true, as Busby now argues in this appeal, that Phifer might have tried to distinguish the

14

above cases on the grounds that they involved intrusions into an inmate's cell, rather than reading a prisoner's mail. But any Fourth Amendment argument would be hampered by the need to establish that Busby had a legitimate expectation of privacy in the unsealed letters that he gave to prison officials, a difficult argument to make.[4] Indeed, if Phifer had investigated this particular matter further, he would have found that the leading case on the use of inculpatory jailhouse letters is still <u>Stroud v. United States</u>, 251 U.S. 15 (1919). In <u>Stroud</u>, the Supreme Court held that there was no violation of the Fourth Amendment when an inmate's letters, read by jailers pursuant to jail practice, were introduced against him at trial. <u>Id.</u> at 21-22.[5]

---

[4] The Seventh Circuit has rejected a similar Fourth Amendment challenge to the use of jailhouse letters, observing as follows:

> The record affirmatively shows that the prison requires inmates to leave their letters unsealed and that [the defendant] had left unsealed the two letters at issue in this case. It is therefore clear that he had no expectation of privacy with respect to their contents. Because [the defendant] demonstrated an expectation that his mail was being inspected, we have no difficulty agreeing with the district court's refusal to suppress [the defendant's] letters.

<u>United States v. Whalen</u>, 940 F.2d 1027, 1035 (7th Cir. 1991).

[5] Later cases involving the same fact pattern——prisoners' or pretrial detainees' letters being read by jailers and then used against them——generally reach the same result, though the more recent cases sometimes require that the jail at least present a justification for its mail policy. <u>See, e.g.</u>, <u>Whalen</u>, 940 F.2d at 1034-35; <u>United States v. Kelton</u>, 791 F.2d 101, 102-03 (8th Cir. 1986). <u>See generally</u> Gary D. Spivey, Annotation, <u>Censorship and Evidentiary Use of Unconvicted Prisoners' Mail</u>, 52

15

Although any appellate challenge to the admission of the letters would have been difficult and almost certainly unsuccessful, it would not have been a frivolous issue for counsel to raise.[6] A point of error involving the letters, despite its weakness, might have been a stronger issue than some, but by no means all, of the issues that Phifer did raise on appeal. And given that the issue could be barred on later collateral review if not raised on direct appeal,[7] a reasonable appellate advocate could certainly have decided to pursue the issue despite its low likelihood of success. But, at the same time, we do not believe that Phifer's decision not to pursue the

---

A.L.R.3d 548 (1973 & Supp. 2003).

[6] Although the prevailing view is to the contrary, see supra note 5, challenges like Busby's have in some cases prevailed. In State v. Ellefson, 224 S.E.2d 666 (S.C. 1976), the South Carolina Supreme Court found that the exclusionary rule barred the use of a pretrial detainee's outgoing letters that were read by a jailer and then turned over to a detective. A Texas appellate court, in an unpublished disposition, has distinguished Ellefson on the ground that the activities in Ellefson were "unrelated to jail security and . . . done at the request of a detective who was not connected with jail operations and whose efforts were 'entirely investigatory,' 'exploratory,' and 'indiscriminate.'" Miller v. State, No. 01-94-01040-CR, 1995 WL 632066, at *1 (Tex. App.—Houston [1st Dist.] Oct. 26, 1995) (quoting Ellefson, 224 S.E.2d at 668, 670), denying motion for reh'g in 1995 WL 569670 (Tex. App.—Houston [1st Dist.] Sept. 28, 1995, pet. ref'd).

[7] Indeed, in the federal habeas proceedings the state has asserted that any challenge to the letters is barred from federal review because Busby defaulted the issue in the state courts. The district court did not apply the procedural default, however. As explained later in this opinion, we do not rely on the default either. See infra II.C.1.

16

issue was "outside the wide range of professionally competent assistance," Strickland, 466 U.S. at 690, to which a criminal defendant is entitled. Soria was similar enough to be persuasive authority in the Court of Criminal Appeals against Busby's position, and Phifer simply cannot be said to have failed to discover controlling authority that would have shown that the letters should have been suppressed; on the contrary, as we have observed, the prevailing view is that there is no constitutional violation in cases like this one. Whether or not Phifer's choice of issues on appeal was the best decision, we believe it was within the range of decisions that a reasonably informed attorney could make.

Even more to the point, given that AEDPA governs this case, Busby's ineffective assistance of counsel claim cannot satisfy § 2254(d)'s exacting standards for granting habeas relief. As we stated in a previous case,

> It bears repeating that the test for federal habeas purposes is not whether [the petitioner made the showing required under Strickland]. Instead, the test is whether the state court's decision——that [the petitioner] did not make the Strickland-showing——was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (Strickland), for succeeding on his [ineffective assistance of counsel] claim.

Schaetzle v. Cockrell, 343 F.3d 440, 444 (5th Cir. 2003), cert. denied sub nom. Schaetzle v. Dretke, No. 03-7511, 2004 WL 76777 (Jan. 20, 2004). Here, the state habeas court's findings of fact and conclusions of law stated, inter alia, that Busby had no

17

legitimate expectation of privacy in unsealed non-privileged mail, that Phifer was not deficient for failing to raise the issue of the letters, and that a point of error on the issue would not have resulted in reversal. This last finding is especially difficult for us to assail given that the Texas state courts, in a decision rendered shortly after Busby filed his briefs in the direct appeal, rejected an effort to suppress an inculpatory outgoing letter read by jailers pursuant to the state's inmate mail policy. See Merritt v. State, 982 S.W.2d 634, 635 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd, untimely filed).[8]

While an objection to the use of the letters would most naturally be framed as a Fourth Amendment claim, Busby also claims in this appeal that the jail's policy violated the First Amendment. It is true, as Busby argues, that neither Soria nor the cases it cites involved a First Amendment challenge to reading and using an inmate's mail. We do not believe, however, that Busby's attorney can be deemed constitutionally deficient for failing to raise such a challenge. As we explain in greater

---

[8] The decision in Merritt appears to rest in part on the fact that the inmate handbook notified inmates that non-privileged mail could be opened and read. See 982 S.W.2d at 635. It is unclear from the opinion what exactly the handbook said; in this case, as described earlier, the handbook given to Busby did not explicitly say that mail would be read, but it did tell inmates to leave their non-privileged mail unsealed or else it would not be accepted. Merritt also relied on the broader principle that "numerous court cases have allowed prison mail to be censored." Id.

18

detail below, the jail's policy did not violate the First Amendment under prevailing standards and, even if it did, Busby would need to explain why material so obtained must be suppressed at trial. Busby's appellate attorney was not constitutionally deficient in this particular case for failing to ask the Court of Criminal Appeals to reject the weight of established authority. Cf. Lucas v. Johnson, 132 F.3d 1069, 1078-79 (5th Cir. 1998) (stating that the habeas petitioner "failed to demonstrate deficient performance because counsel is not required to anticipate subsequent developments in the law"). A fortiori, the state court's decision that counsel's performance was not deficient is not an unreasonable application of the governing law.

We conclude that Busby is not entitled to relief on his ineffective assistance of counsel claim.

## C.    First Amendment

In his state habeas application, and again in his federal petition, Busby claimed that the jailhouse letters were obtained in violation of the First Amendment and therefore that the trial court denied him his constitutional rights in admitting the letters into evidence over his objection. In ruling on the First Amendment issue, the state habeas court noted in one of its findings of fact that Busby failed to raise the issue on direct appeal, and it stated in one of its conclusions of law that Busby

19

was therefore "procedurally barred from raising it by writ of habeas corpus."  The state urges us to dispose of Busby's First Amendment claim on the ground that it has been procedurally defaulted in the state courts.  We therefore first address this threshold issue.

1.   Procedural default

The general rule is that the federal habeas court will not consider a claim that the last state court rejected on the basis of an adequate and independent state procedural ground.  Coleman v. Thompson, 501 U.S. 722, 729-32 (1991); Fisher v. Texas, 169 F.3d 295, 300 (5th Cir. 1999).  In this case, the state habeas court expressly stated that Busby's claim was procedurally barred because he did not raise it on direct appeal.  The court then went on to make several further conclusions of law to the effect that the claim was substantively meritless.  That the court reached these additional conclusions does not undermine the explicit invocation of the procedural bar.  See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989); Fisher, 169 F.3d at 300 ("A state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claim.").

The general rule that we will not consider claims that were ruled procedurally barred in the state courts is subject to a number of limitations.  A procedural default will be excused, for instance, if "the prisoner can demonstrate cause for the default

20

and actual prejudice as a result of the alleged violation of federal law" or if the default would work "a fundamental miscarriage of justice." Coleman, 501 U.S. at 750; see also Haley v. Cockrell, 306 F.3d 257, 263 (5th Cir. 2002). Ineffective assistance of counsel is sufficient "cause" for a procedural default. Murray v. Carrier, 477 U.S. 478, 488 (1986). As we have already seen, Busby does in fact argue that his counsel in his direct appeal was constitutionally ineffective for failing to pursue the issue regarding the letters. We rejected that contention above, and so this method of excusing a default is unavailable.[9]

To produce a federally cognizable default, the state procedural rule "must have been 'firmly established and regularly followed' by the time as of which it is to be applied." Ford v. Georgia, 498 U.S. 411, 424 (1991); see also Stokes v. Anderson,

---

[9]     Busby also argues that there was cause for any default because his First Amendment claim is novel. "[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures." Reed v. Ross, 468 U.S. 1, 16 (1984). But Busby's First Amendment claim, while admittedly unusual, is not "novel" in the requisite sense; that is, its legal building blocks were not unavailable to counsel at the time of the direct appeal. On the contrary, Busby's First Amendment argument relies on decades-old Supreme Court cases, as will appear below. The "novelty" argument for excusing a procedural default is not available in such circumstances. See id. at 19-20 (citing Engle v. Isaac, 456 U.S. 107, 131-32 (1982)); Landry v. Lynaugh, 844 F.2d 1117, 1120 (5th Cir. 1988) (rejecting novelty as an excuse for default when the habeas petitioner relied on constitutional standards "that were already in place at the time of his trial").

21

123 F.3d 858, 860 (5th Cir. 1997).  In this case, the district court found that the state procedural rule——that record-based claims not raised on direct appeal will not be considered in habeas proceedings——was not yet regularly applied at the relevant time.  For the district court, the relevant time was apparently April 1998, when Busby filed his brief in his direct appeal.

According to the state, the state procedural rule relied upon herein was firmly established by the Texas courts in the case of Ex parte Gardner, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996, clarified on reh'g Feb. 4, 1998).  See Rojas v. State, 981 S.W.2d 690, 691 (Tex. Crim. App. 1998) (Baird, J., concurring) ("In my opinion, based on Gardner, the Court now bars every record claim not raised on direct appeal as procedurally defaulted.").  Although Gardner was originally issued in 1996, it is the opinion on rehearing, issued in February 1998, that purportedly firmly entrenched the procedural rule upon which the state relies.[10]  In March 2000, we issued a decision in which we held, though with little comment, that the Gardner rule set forth an adequate state ground capable of barring federal habeas review.  See Soria v. Johnson, 207 F.3d 232, 249 (5th Cir. 2000);

---

[10]    Gardner called the rule "well-settled" and cited previous cases that had invoked it.  959 S.W.2d at 199.  Other pre-Gardner cases of fairly recent vintage did not invoke the rule, however.  See, e.g., Ex parte Goodman, 816 S.W.2d 383, 385 (Tex. Crim. App. 1991).  Since the state does not contend that the rule was regularly followed before Gardner, we need not look into the pre-Gardner history of the rule.

see also <u>Finley v. Johnson</u>, 243 F.3d 215, 219 (5th Cir. 2001) (likewise invoking <u>Gardner</u>).  The state habeas court, which invoked the bar, rendered its decision in April 2000.

Although the state procedural rule was apparently firmly established and regularly followed by the time the state habeas court invoked it to bar Busby's new claims in April 2000, the district court evidently believed that the legally relevant time period came earlier, namely in the months leading up to April 1998, when Busby's attorney was completing and filing Busby's brief in the direct appeal.  Moreover, although the opinion on rehearing in <u>Gardner</u> was issued in February 1998, shortly before Busby's main brief in his direct appeal was filed, the district court did not think that the rule was sufficiently entrenched until Judge Baird's concurring opinion in <u>Rojas</u>, issued in December 1998.  Since the district court decided that the rule was not being consistently applied when Busby's appellate counsel was preparing and filing his briefs, the court concluded that it would be unfair to invoke the procedural default.

As stated above, a state procedural rule "must have been 'firmly established and regularly followed' by the time as of which it is to be applied."  <u>Ford</u>, 498 U.S. at 424.  This court has not yet decided whether the relevant date for application of the <u>Gardner</u> rule is the time at which the state habeas court imposes the bar (here, April 2000) or instead the time at which the litigant engages in the conduct that produces the bar (here,

23

April 1998 and perhaps a few months before).  We have held, in the related context of the Texas abuse of the writ doctrine, that the controlling date for purposes of that procedural bar is the date on which the state court dismisses the application as an abuse of the writ, not the date on which the prior application (which triggers the doctrine) is filed.  See Barrientes v. Johnson, 221 F.3d 741, 759-61 (5th Cir. 2000).  But when faced with the same question that is before us today——i.e., the triggering date for a state procedural rule that bars state habeas review of claims that could have been raised on direct appeal——the Ninth Circuit has squarely held that the relevant time is the date of the direct appeal, which is when the claims should have been raised.  See Fields v. Calderon, 125 F.3d 757, 760-61 (9th Cir. 1997).  The court reasoned that "the procedural default, though announced by the [state court] when the habeas petition is denied, technically occurs at the moment the direct appeal did not include those claims that should have been included for review."  Id. at 761.  The court stated, moreover, that using the date of the direct appeal as the trigger date served the purpose of ensuring that counsel in the direct appeal had notice that failure to raise an issue would forfeit it.  Id.

Although the question of procedural default "should ordinarily be considered first," we need not do so "invariably," especially when it turns on difficult questions of state law. Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also

24

<u>Glover v. Hargett</u>, 56 F.3d 682, 684 (5th Cir. 1995).  In order to determine whether Busby's claim is procedurally defaulted, we would have to decide (1) when precisely the state procedural rule became firmly entrenched and (2) when the rule was triggered.  In this case, we believe that Busby's First Amendment claim can be resolved more easily by looking past any procedural default.  Accordingly, we shall assume that the claim is not defaulted.

2.    <u>Whether Busby is entitled to relief</u>

There is some confusion over the precise nature of Busby's First Amendment claim.[11]  The district court's decision granting the COA described the issue as "[w]hether the trial court's denying [Busby's] motion to suppress the letters violated his rights under the First Amendment."  It may be that the district court was merely making a shorthand reference to the somewhat longer version of the claim set forth in Busby's petition.  Busby's habeas petition and his brief here both cast the claim as whether Busby was denied his fundamental due process, due course

---

[11]    In part, this is because Busby's claim would more naturally be thought of as essentially involving a violation of the Fourth Amendment's exclusionary rule, applicable against the states under <u>Mapp v. Ohio</u>, 367 U.S. 643 (1961).  Indeed, Busby's habeas petition filed in the district court asserted not only the First Amendment claim at issue here but also, <u>inter alia</u>, a claim that the letters should have been excluded because they were obtained in violation of the Fourth Amendment's limitations on search and seizure.  The district court properly denied this claim under the rule of <u>Stone v. Powell</u>, 428 U.S. 465 (1976).  As we will note later, the state contends that Busby's First Amendment claim is really no more than a Fourth Amendment claim in disguise and should likewise be barred under <u>Stone</u>.

of law, and fair trial rights under the Fourteenth Amendment when the trial court admitted into evidence, over his objection, copies of personal letters obtained in violation of the First Amendment. That is, as Busby describes it, the claim essentially involves a Fourteenth Amendment due process violation predicated upon the use of evidence obtained in violation of the First Amendment.

Whatever the precise manner of phrasing the claim, its necessary predicate is that the jailers' actions somehow violated the First Amendment. This court has addressed this issue before. In Guajardo v. Estelle, 580 F.2d 748 (5th Cir. 1978), Texas inmates brought a comprehensive challenge to the state correctional system's policies regarding inmates' mail privileges. We recognized that inmates' correspondence with the media and with attorneys carried special constitutional weight; we therefore held that inmates' letters to reporters and attorneys should be mailed out without being opened and read by prison officials and that inmates should have a right to be present when incoming mail from such persons was opened and inspected for contraband. Id. at 758-59.[12] But we found that inmates' other correspondence could properly be subjected to much greater control. In particular, we decided that legitimate

_____

[12] Our more recent cases have responded to subsequent Supreme Court decisions by overruling some of Guajardo's protections. See Brewer v. Wilkinson, 3 F.3d 816, 824-25 (5th Cir. 1993).

26

penological concerns regarding security, order, and rehabilitation permitted prison officials to read all incoming and outgoing general correspondence.  Id. at 755 n.4, 756–57. The Cherokee County Jail's mail policies, as gleaned from the policy manual introduced in evidence at Busby's trial, track quite closely the rules laid out in Guajardo.  The state habeas court's findings of fact and conclusions of law stated that the jailers' actions served a valid penological purpose and complied with state regulations.[13]

Given that jail officials could legitimately read Busby's mail, we do not think that the First Amendment would bar them from turning letters over to the prosecutors if the jailers happened to find valuable evidence during their routine monitoring.  See Gassler v. Wood, 14 F.3d 406, 408-10 (8th Cir. 1994).  What has happened here is essentially that agents of the state "overheard" a damaging admission during the course of their duties.  Whatever other legal challenges may exist regarding the

---

[13]    We can assume that the prisoners in Guajardo were aware that their mail was being read, but Busby's assertion that he was never explicitly told about this practice does not lead to a different result.  (The inmate handbook given to Busby did advise him that non-privileged mail should be turned over to jailers unsealed.)  The principal harm in reading inmates' outgoing mail, from the point of view of the First Amendment, is presumably that it chills inmates' speech and impairs their ability to convey their true thoughts to outsiders.  See Procunier v. Martinez, 416 U.S. 396, 423 (1974) (Marshall, J., concurring).  If Busby were truly unaware that jailers were reading his mail, that might strengthen claims rooted in the Fourth Amendment or Miranda, but it would weaken Busby's First Amendment claim.

jailers informing investigators of what they learned, we do not see how the First Amendment would prevent them from passing that information along.  The state officials are not punishing Busby for his speech, and while it is true that his speech had damaging consequences, that is true of all admissions and confessions.

Even if we were able to reach a different result on the merits of the First Amendment question, the more important point in a habeas case governed by AEDPA is that we may not grant relief unless the state's adjudication of Busby's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1). In this case, the state habeas court concluded that the jail's policy of reading outgoing non-privileged correspondence served valid penological purposes and that "the reading and copying of a county jail inmate's outgoing non-privileged mail does not violate the First and Fourteenth Amendments to the United States Constitution."[14]

---

[14]    That the state habeas court also invoked a procedural bar as an alternative basis to deny relief does not deprive the state of the benefit of AEDPA's deferential standard.  Based on the state court record, it is clear that the state courts have rejected the substance of Busby's claim; the rejection of his First Amendment claim is therefore "an adjudication on the merits" within the meaning of § 2254(d).  See Mercadel v. Cain, 179 F.3d 271, 274 (5th Cir. 1999); see also Johnson v. McKune, 288 F.3d 1187, 1192 (10th Cir. 2002).

The state's determination is not contrary to or an unreasonable application of Supreme Court precedent. The Supreme Court has never held that reading inmate mail violates the First Amendment. The primary case relied upon by Busby is Procunier v. Martinez, 416 U.S. 396 (1974), a § 1983 case involving First Amendment limitations on censorship of inmate mail. The Martinez Court held that jailers could censor (i.e., redact or reject) an inmate's outgoing and incoming mail only if the jail policies furthered a substantial governmental interest and limited First Amendment freedoms no more than necessary to protect that governmental interest. Id. at 413. Later Supreme Court cases have given authorities greater leeway in restricting inmates' rights regarding mail, and Martinez has been overruled at least in part. See Brewer, 3 F.3d at 822-25 (tracing the impact of Wolff v. McDonnell, 418 U.S. 539 (1974), Turner v. Safley, 482 U.S. 78 (1987), and Thornburgh v. Abbott, 490 U.S. 401 (1989)). Even without those later cases, Martinez on its own terms does not hold that reading an inmate's mail violates the First Amendment. As the Court observed in a case decided shortly after Martinez, "freedom from censorship is not equivalent to freedom from inspection or perusal." McDonnell, 418 U.S. at 576.[15]

_____

[15] The McDonnell Court concluded that a policy whereby prison officials could open mail from the inmate's attorney in the inmate's presence passed constitutional muster. 418 U.S. at 577. This court has subsequently determined that opening and inspecting an inmate's incoming legal mail outside of his presence does not violate the Constitution. See Brewer, 3 F.3d

29

Highlighting the contrast, Justice Marshall's concurring opinion in <u>Martinez</u> noted that the Court had reserved the issue of the First Amendment implications of reading inmate mail; he would have gone further and held that prison officials do not have a general right to open and read inmate mail.  396 U.S. at 422 (Marshall, J., concurring).  Indeed, as one of our sister circuits has stated, <u>Martinez</u>'s holding that certain types of mail can be censored <u>implies</u> that mail can be read.  <u>Altizer v. Deeds</u>, 191 F.3d 540, 548 (4th Cir. 1999) ("Otherwise, a prison official would never know that a letter contained the very type of material that, according to the Supreme Court, could rightfully be censored . . . .").  Finally, the only Supreme Court case that actually addresses the evidentiary use of inculpatory jailhouse letters is <u>Stroud</u>, which, while not addressing the First Amendment, found that there was no violation of the Fourth or Fifth Amendments in such a situation.  251 U.S. at 21-22.  The state court's decision is thus not contrary to Supreme Court precedent, nor does it apply the governing law to the facts of this case unreasonably.

Even if the jailers' actions were improper under the First Amendment, Busby would still need to explain why items so obtained must be suppressed.  The state argues that such a "First Amendment exclusionary rule" would be a new rule of criminal

---

at 825.

30

procedure, which we may not announce on habeas review.  See

Teague v. Lane, 489 U.S. 288, 310 (1989) (plurality opinion).

Additionally, the state contends that Busby's argument——though

nominally invoking the First Amendment——is at bottom essentially

a Fourth Amendment claim in that it seeks the exclusion of

improperly obtained evidence.  Although Busby's complaint about

the letters is probably strongest as a Fourth Amendment argument,

such claims are of course not cognizable in federal habeas corpus

proceedings.  See Stone v. Powell, 428 U.S. 465, 494-95 (1976).

Given our conclusion above, we need not address these arguments

further.

## D.  Pretrial Publicity

Busby's habeas petition also claims that media coverage of

his case poisoned the atmosphere, depriving him of the right to

an impartial jury and due process of law.

The district court concluded that this claim had not been

exhausted in the state courts.  Rather than dismissing the

petition, as is generally required under Rose v. Lundy, 455 U.S.

509 (1982), the district court recognized that it has the

authority to retain jurisdiction and instead deny the claim on

the merits, which it did.  See 28 U.S.C. § 2254(b)(2) (2000);

Mercadel, 179 F.3d at 276.

Habeas petitioners must exhaust state remedies by pursuing

their claims through one complete cycle of either state direct

31

appeal or post-conviction collateral proceedings.  See Orman v. Cain, 228 F.3d 616, 620 & n.6 (5th Cir. 2000); Bledsue v. Johnson, 188 F.3d 250, 254 n.8 (5th Cir. 1999).  The exhaustion requirement means that a habeas petitioner "must fairly present the substance of his claim to the state courts."  Finley, 243 F.3d at 219 (citing Picard v. Connor, 404 U.S. 270, 275-76 (1971)).

Before trial, Busby moved for a change of venue.  His motion was supported by affidavits from two people who stated that Busby could not receive a fair trial in Cherokee County.  The state opposed the motion with two affidavits that controverted Busby's.  Busby's legal arguments in support of the motion focused largely on the technical requirements of the state statute providing for changes of venue, but Busby also invoked Sixth Amendment fair trial rights and Fourteenth Amendment due process considerations when the motion was orally argued to the trial judge.  On direct appeal, Busby did not raise the federal constitutional claim he is now raising in his federal habeas petition.  He instead argued, in his third point of error, that the trial court should have granted his motion to change venue as a matter of law under the state statute because the state's affidavits were (Busby argued) legally insufficient to controvert his supporting affidavits.  In his fourth point of error, he did raise federal and state constitutional challenges to the trial court's denial of the motion, but the legal arguments were very different from

32

those asserted here. The argument of the fourth point of error was that the trial court violated due process and equal protection by permitting the state to controvert Busby's affidavits with affidavits that were patently not credible. That is, the challenge went to the constitutionality of the court's recognition of the state's controverting affidavits, not to the merits of the underlying motion or to the pretrial atmosphere itself. The brief accordingly did not cite any of the evidence of prejudicial media coverage developed in the hearing in the trial court. Therefore, since Busby's claim here involves a wholly different legal claim, and a factual basis not argued to the state appellate court, he did not fairly present the substance of his claims to the state courts as generally required under the exhaustion doctrine. Nor did Busby raise his pretrial publicity claim in his state habeas case.[16]

Nonetheless, a habeas petitioner who has failed to properly present his federal constitutional claims to the state courts can still be considered to have exhausted his state remedies if the state courts are no longer open to his claim because of a

---

[16] At oral argument in this court, Busby's counsel conceded that the venue-related claims raised in the state courts differed from the claim being raised here. He stated that he would prefer to abandon this claim rather than have the habeas petition dismissed as partially unexhausted. As we explain in the next paragraphs in the text, the claim is technically exhausted because the state courts are no longer available to Busby; the failure to raise the claim in the state courts is thus a basis for holding the claim procedurally defaulted, as the state urges.

procedural bar.  "A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."  Coleman, 501 U.S. at 732.  However, the same procedural bar that satisfies the exhaustion requirement at the same time provides an adequate and independent state procedural ground to support the state judgment "and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default."  Gray v. Netherland, 518 U.S. 152, 162 (1996); see also Coleman, 501 U.S. at 735 n.*.

The state asserts that if Busby tried to return to the state courts to present his claim in a habeas application, his application would be dismissed as an abuse of the writ.  This court has previously held that the Texas abuse of the writ doctrine is an adequate ground for considering a claim procedurally defaulted.  Nobles v. Johnson, 127 F.3d 409, 422–23 (5th Cir. 1997); Fearance v. Scott, 56 F.3d 633, 642 (5th Cir. 1995).  As the doctrine is currently codified for capital cases, it provides as follows:

> If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
>
> (1) the current claims and issues have not been and could not have been presented previously in a timely

34

initial application or in a previously considered application [for habeas relief] because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the [penalty phase of the trial].

TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5(a) (Vernon Supp. 2004). There is no indication that the factual or legal basis for Busby's claim was previously unavailable, as required under paragraph (1). On the contrary, the issue was raised at Busby's trial. Nor can Busby show that he could satisfy the tests in paragraphs (2) and (3). Given the strong evidence of both guilt and future dangerousness, rational jurors who were totally unaffected by pretrial publicity certainly could have found Busby guilty and answered the special issues as they did. When the result of filing a second habeas application in the state courts is so clear, it is appropriate to consider the petitioner's claim barred rather than first requiring the state court to deny a successive writ. See Teague, 489 U.S. at 297-98; Horsley v. Johnson, 197 F.3d 134, 136-37 (5th Cir. 1999); Nobles, 127 F.3d at 422-23.

When a habeas petitioner's claims are procedurally defaulted, we may excuse the default only if the petitioner shows

35

cause for the default and prejudice resulting therefrom, or if the default would work a fundamental miscarriage of justice. Coleman, 501 U.S. at 750; Finley, 243 F.3d at 220. Busby has not attempted to establish any cause for the default, nor does he assert the miscarriage of justice exception, such as by claiming that he is innocent. We are therefore unable to grant relief as Busby's claim is defaulted.

Moreover, if we were to reach the merits, we would find that Busby's claim fails. Busby does not attempt to show that the particular jurors selected for service in his case were biased against him, as one usually must do. See Mayola v. Alabama, 623 F.2d 992, 996 (5th Cir. 1980). His argument, and the evidence adduced at the pretrial hearing, instead refers to the general environment in Cherokee County. That is, he would have us presume that the jury was prejudiced against him by virtue of the press coverage described earlier in this opinion. The Supreme Court addressed a similar argument in Dobbert v. Florida, 432 U.S. 282, 303 (1977), where it said the following:

> Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. But under [Murphy v. Florida, 421 U.S. 794 (1975)], extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware

36

of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial.  This we will not do in the absence of a "trial atmosphere . . . utterly corrupted by press coverage," Murphy[, 421 U.S. at 798].

The leading case in which the Supreme Court found that a change of venue was necessary without any showing as to the jurors' biases is Rideau v. Louisiana, 373 U.S. 723 (1963). There, a local television station broadcast on three straight days a twenty-minute film of the defendant's jailhouse interrogation, in which he admitted in detail to the bank robbery, kidnapping, and murder with which he was charged.  The parish had a population of 150,000, and the three broadcasts were seen by 24,000, 53,000, and 29,000 of the parish's residents, respectively.  Id. at 724.[17]  Under those circumstances, the Court reversed the conviction "without pausing to examine a particularized transcript of the voir dire examination of the members of the jury."  Id. at 727.

As should be clear from the lengthy quotation from Dobbert set out above, Rideau's rule of presumed prejudice is applicable only in the most unusual cases.  "[T]he Rideau principle of presumptive prejudice is only rarely applicable and is confined to those instances where the petitioner can demonstrate an extreme situation of inflammatory pretrial publicity that

---

[17]    As the dissent in Rideau pointed out, it was unclear to what extent the viewership on these three occasions overlapped. 373 U.S. at 731-32 (Clark, J., dissenting).

37

literally saturated the community in which his trial was held."
Mayola, 623 F.2d at 997 (citations and internal quotation marks
omitted). Busby's case does not satisfy that standard. Though
Cherokee County is small, with a population of around 42,000
according to the record, it was not saturated with inflammatory
coverage. The Jacksonville Daily Progress, which ran at least a
dozen articles on the case, had a paid circulation of
approximately 5,500; the local weekly paper, which gave the case
much less prominent coverage, had a circulation of around 3,500.
The two local papers' coverage of the killings was "largely
factual in nature," Murphy, 421 U.S. at 802, tracing developments
in the case rather than engaging in sensationalism.[18] It is also
relevant that the coverage of the case, heaviest right after the
killings, tailed off markedly in the months preceding trial.
Most of the articles admitted into evidence were from April and
early May 1995. Only three appeared after July 1995. Voir dire
did not begin until May 1996 and the opening statements were not

---

[18]  This characterization is true even of the article that
mentioned an allegation that Busby was a Satanist. The article,
which ran in the Daily Progress on May 3, 1995, under the
headline "Defense enters appeal for evidence," ticked off a list
of revelations from a pretrial hearing at which Kelley identified
Busby as the shooter. The list included a sentence that referred
to "[t]he allegation the defendant was a Satanic worshiper."
Later in the story, the reader finds a sentence reporting that
Kelley testified at the hearing that three days before the
shootings Busby said that he had sold his soul to the devil.
These types of allegations certainly present a great potential
for prejudice, but here the allegation simply was not given the
prominent, recurring attention that could irretrievably poison
the jury pool.

heard until July 1996.  Cf. id. at 802-03 (holding that pretrial publicity did not prejudice the defendant and observing that most of the newspaper articles at issue were run seven months before the jury was selected).

The testimony at the hearing on the change of venue motion confirms that the atmosphere in Cherokee County was not "utterly corrupted" by unfavorable publicity.  While several of the defense's witnesses said that the case had been a major topic of conversation and opined that Busby could not get a fair trial in Cherokee County, the state showed on cross-examination that some of these witnesses had connections to Busby's family.  Most of the witnesses who testified at the trial, including most of those called by the defense, said that the case had not provoked a great deal of discussion in the community, at least not since the period immediately following the killings.  Several witnesses testified that they did not read the Daily Progress but instead read newspapers from Tyler or Lufkin, which newspapers were apparently more popular than the Daily Progress in parts of Cherokee County.  In sum, we do not believe that the atmosphere was so biased against Busby that we can presume that voir dire would be incapable of producing a proper jury.  As we have already said, there is no contention here that the actual jurors selected for the case were biased.

### III. CONCLUSION

For the foregoing reasons, the district court's judgment denying habeas relief is AFFIRMED.